Dutchess County Mutual Insurance Co. agt. Hachfield.

## SUPREME COURT.

The Dutchess County Mutual Insurance Company, respondent, agt. Albert Hachfield and others, appellants.

*Purchase of stolen bonds—for value and without notice.*

A municipal bond, payable in blank, with the addition following the blank of the terms "his executors, administrators or assigns," &c., is *negotiable* under the mercantile law.

Where the evidence on the trial showed that such bonds had been feloniously stolen from the plaintiff, their lawful owner, shortly before they were purchased by the defendants, *held*, that this imposed the obligation upon the defendants of proving, to the satisfaction of the jury, that their purchase was made for value, and in good faith, before they could establish a title to the bonds superior to that of the plaintiff as the preceding owner.

Where fraud or illegality in the negotiation of commercial paper is shown, the law presumes a want of consideration in the transfer, and this presumption must be rebutted by the holder showing affirmatively that he gave value.

Proof on the trial was given by the defendants, tending to overcome the presumption arising out of the circumstance that the stolen bonds were found in their possession, by showing that they were purchased by them for a valuable and adequate consideration, without notice of any infirmity in the title of their vendor.

After the charge of the court had been delivered to the jury, the defendants' counsel requested the court to instruct the jury that if "Hachfield & Co. purchased these bonds in the open market for full value, and in the usual course of business, without notice or suspicion, they were not bound to make a close and critical examination in order to escape the imputation of bad faith in the purchase." The court declined to charge this proposition, and left it to the jury to say how much of an examination they were to make, and the defendants excepted to the refusal.

*Held*, that this was error. The proposition presented by this exception seemed to be faultless. It presented the case of a purchase for full value, in the ordinary course of business, without notice or suspicion

Dutchess County Mutual Insurance Co. agt. Hachfield.

of the robbery creating the infirmity of title. And that was all which the law required to be established to protect the defendants as the owners of the bonds.

Judgment reversed, and a new trial ordered, with costs to abide the event.

*First Department, General Term, May,* 1874.

*Before* NOAH DAVIS, *P. J.,* BRADY *and* DANIELS, *JJ.*

APPEAL from judgment, and also from order denying motion made on the judge's minutes for a new trial.

*Coles Morris and Michael H. Cardoza,* for appellants.

This was an action of replevin, brought by the plaintiff against the defendants to recover the possession of five city of Poughkeepsie bonds of $1,000 each, held by the defendants, and claimed by the plaintiff as its property. On the night of the 8th or morning of the 9th of October, 1869, a robbery took place at the office of the plaintiff; their safe was blown open, and these bonds and other securities were stolen therefrom. The form of the bond appears in the case.

The defendants were brokers, doing business in this city, dealing in bonds and other securities. The defendant Hachfield attended personally to the department of buying and selling bonds. They purchased these bonds on November 9th, 1869, of one Edward Kendrick, at ninety-six cents on the dollar, their fair market value, in the ordinary course of their business, paid for them by a check drawn by Stoker, Taylor & Co., bankers, to their (defendants') order, and indorsed by the latter to Kendrick & Co., or order. At the time of this purchase none of the defendants had the slightest *notice, knowledge* or *suspicion* that these bonds had been stolen, and it was not until the close of business on the day of the purchase that they heard that *some* Poughkeepsie city bonds had been stolen.

The defendants then made further inquiry; could not

ascertain the numbers of the stolen bonds, and telegraphed to Poughkeepsie for that purpose, as they desired to know whether the bonds were all right, having sold them, and intending to deliver them on the following day.

They then first discovered that they had purchased stolen bonds, and were then, for the *first* time, informed of this robbery at Poughkeepsie.

Immediately upon hearing that they had the stolen bonds in their possession, the defendants went to the bank on wh' ;h the check they had given in payment therefor was dra¿ ¿, endeavored to stop it, but this they could not do, as it h¿ ¿ been certified, and stood as an indebtedness against th¿ bank.

The reputation of Kendrick at the time the defendant purchased these bonds was very fair, and he seems to have been more the victim of circumstances than a wrong-doer.

The defendant Hachfield had, previously, some sixteen or seventeen transactions with Kendrick, all of which, with one exception, and this had been abundantly explained, had been perfectly satisfactory and free from suspicion.

Hachfield, in view of the danger attending these transactions, as a prudent man, recollecting the other affair with Kendrick, cautioned the latter to be sure the person from whom the bonds came was all right; was assured of his responsibility; that he, Kendrick, had dealt with the man before, and had always found him perfectly straightforward.

It is not the custom for brokers to disclose their customers' names, and therefore was it that Hachfield did not inquire of Kendrick the name of his principal.

It appears that, in the course of dealing in negotiable securities, purchasers in good faith often obtain securities which afterwards prove to have been stolen.

The *only* witness examined on behalf of the plaintiff was Le Grand Dodge, who proved nothing but the loss of the bonds in question by the plaintiff and their production by the defendants at the Jefferson-market police court. The

only testimony by which it was *attempted* to destroy the title of the defendants was by the cross-examination of the defendants' *own* witnesses, and this by endeavoring to show that which was entirely immaterial, viz., that because the defendant Hachfield had previously one transaction with Kendrick which related to stolen bonds, but which had been well explained, therefore the defendants were prohibited from again dealing with Kendrick at all, or, at any rate, without first ascertaining that Kendrick's principal was really a *bona fide* holder.

But the defendants had no suspicion that these bonds were stolen; this former transaction left no unfavorable impression on Hachfield's mind. Hachfield's confidence in Kendrick remained unimpaired, for he had subsequent dealings with him that were free from any question. The defendants showed no anxiety to purchase, and Kendrick was in no hurry to sell these bonds, the negotiations extending over several days. After they were offered to them by Kendrick they wrote to Poughkeepsie and Albany, describing the bonds, and asking for a bid. Mr. Rudd, the cashier of a Poughkeepsie bank, replied, offering ninety-five per cent, Mr. Van Antwerp, of Albany, ninety-eight per cent, no allusion to the robbery being made; and upon the strength of the latter's bid they purchased at ninety-six per cent, expecting to make a profit of one hundred dollars.

The defendants made no attempt to deliver the bonds when they found they were stolen, but retained them and produced them at the police court, and assisted as far as possible in the prosecution of Kendrick.

The defendants expressly and positively *deny any bad faith* in the premises, and the entire evidence shows that they acted with abundant caution and prudence, with proper care and circumspection.

The verdict was for the plaintiff; judgment was entered thereon in their favor; defendants moved for a new trial, which motion was denied, and defendants appealed from the

judgment herein and from the order denying the motion for a new trial.

I. The plaintiffs' case showed that the defendants had a perfectly valid title to the bonds, because the bonds were negotiable securities, transferable by delivery.

The defendants purchased the bonds in the ordinary course of business for the full value.

This is shown by the evidence of Mr. Dodge, the secretary of the plaintiffs, that Hachfield paid ninety-six per cent for the bonds.

This evidence, having been admitted without objection, has the same weight as if it were the evidence of Hachfield himself.

Ninety-six per cent was certainly the full value of the bonds; there was no fixed market value for them; they were never introduced on the brokers' board in New York city; they were the obligations of a distant municipal corporation, always ready to sell them at par; they were rarely dealt in.

Their market value must, therefore, have been such price as one wishing to sell could obtain, which, in this case, was ninety-six per cent.

The bonds being negotiable securities, passing by delivery, and the defendants having paid full value for them in the ordinary course of business, their title is good against the original owner, unless it is shown that they acted in bad faith.

There is no evidence of bad faith in the plaintiffs' case; there is no evidence that the plaintiffs ever gave any notice of their loss. The defendants did not learn that the bonds were stolen until after they had bought and paid for them.

They had received from Kendrick positive assurances to the contrary.

In the absence of all evidence on this point the court should have dismissed the complaint.

II. The verdict was erroneous, contrary to the law and the evidence. It should be set aside and a new trial granted.

Dutchess County Mutual Insurance Co. agt. Hachfield.

(*a*) The only question for the jury was, did the defendants act in bad faith?

The evidence is overwhelming that they did not.

(*b*) The bonds were negotiable securities and passed by delivery.

(*c*) It is well settled that a bond, whether of a railroad or of a municipal corporation, which is by its terms payable to blank or assigns, is a negotiable security, and is transferable by delivery (*Brainard* agt. *New York and Harlem R. R. Co.*, 25 *N. Y.*, 496; *Van Duzer* agt. *Howe*, 21 *id.*, 531; *The Bank of Rome* agt. *The Village of Rome*, 19 *id.*, 20; *Mechanics' Bank of New York* agt. *New York & New Haven R. R. Co.*, 3 *Kern.*, 599–625; *State of Illinois* agt. *Delafield*, 3 *Paige*, 527; *White* agt. *Vermont & Mass. R. R. Co.*, 21 *How.* [*U. S.*], 575).

III. The evidence is uncontradicted that the defendants purchased these bonds in the usual course of business; that they paid full value for them, and that they had not the slightest notice, knowledge or suspicion that the bonds were stolen.

(*a*) These facts were *conclusive*, and for the plaintiff to show fraud or bad faith on the part of the defendants became impossible. In this way alone could the title of the defendants to the bonds in question be defeated.

(*b*) The burden of proof was on the plaintiff, for, as the court say, in *Murray* agt. *Lardner* (2 *Wall.*, 121):

"The burden of proof lies on the person who assails the right claimed by the party in possession."

And the decision of the supreme court of the United States may be truly "regarded as settling the law of the land" (Daly, Ch. J., *Seybell* agt. *The National Currency Bank*, 2 *Daly*).

(*c*) The defendants manifested *no negligence* whatsoever in this transaction, and even if they had been guilty of *gross* negligence, this would not vitiate their title to these bonds (*Welch* agt. *Sage*, 47 *N. Y.*, 146).

(d) They were called upon to make no critical examina-
tion; they were not bound to be on the alert for circum-
stances that might excite the suspicions of wary vigilance;
they owed not the duty of active inquiry to any one; they
were not required to manifest such care as diligent, prudent
men would exercise ( *Welch* agt. *Sage, supra; Magee* agt.
*Badger,* 34 *N. Y.,* 247; *Belmont Branch Bank* agt. *Hoge,*
35 *N. Y.,* 65; *Birdsall* agt. *Russell,* 29 *id.,* 220; *Lord* agt.
*Wilkinson,* 56 *Barb.,* 295; *Goodman* agt. *Simonds,* 20 *How.*
[ *U. S. R.*], 365; *Goodman* agt. *Harvey,* 4 *Ad. & El.,* 870).

In *Magee* agt. *Badger* (*ut supra*), judge PORTER, delivering
the opinion of the court, says:

" One who purchases commercial paper for full value,
before maturity, without notice of any equities between the
original parties, or of any defect of title, is to be deemed a
*bona fide* holder. He is not bound at his peril to be upon
the alert for circumstances which might possibly excite the
suspicions of wary vigilance. He does not owe to the party
who puts negotiable paper afloat the duty of active inquiry to
avert the imputation of bad faith. The rights of the holder
are to be determined by the simple test of honesty and good
faith, and *not by a speculative issue as to his diligence
or negligence.*"

And precisely the same doctrine is reiterated by the court
of appeals in the subsequent case of *Belmont Branch Bank*
agt. *Hoge* (*ubi supra*).

In *Welch* agt. *Sage* (47 *N. Y.,* 146), the late justice PECK-
HAM says:

" The law may be regarded as settled, that a purchaser, for
value advanced, of negotiable paper, *including bonds,* is not
bound to exercise such care and caution as wary, prudent men
would exercise. Negligence will not impair his title. It is
simply a question of good faith in the purchaser; unless the
evidence makes out a case upon which the jury would be
authorized to find fraud or bad faith in the purchaser, it is the
duty of the court to direct a verdict."

Dutchess County Mutual Insurance Co. agt. Hachfield.

In *Lord* agt. *Wilkinson* it is said, " that the purchaser is not bound to be on the alert; he does not *owe* the duty of active inquiry to avert the imputations of bad faith."

In *Goodman* agt. *Harvey* (4 *Ad. & El.*, 870), lord DEN-MAN says:

" I believe we are all of opinion that *gross* negligence only, would not be a sufficient answer where the party has given a consideration for the bill. Gross negligence may be evidence of *mala fides*, but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the holder, without any proof of bad faith in him, there is no objection to his title."

It may well be said that, to establish any other rule than that here enunciated, would paralyze the commercial interests of the country.

That this is the law that ought to govern in the determination of this case, there can. be no possible doubt. The authorities cited are directly in point and controling.

IV. The learned judge, in his charge to the jury, misconceived the law applicable to the case.

True, he does say that the question is as to the *bona fides* of Hachfield & Co., in making the purchase of these bonds; but his charge is clearly erroneous in many parts. In fact, as a whole, it is apparent that it cannot be sustained upon the law or on the evidence in the case. It evidently misinformed and misled the jury.

He instructed the jury that the defendants must have procured the bonds in such a shape as would not have put a prudent man upon inquiry; this was clearly erroneous. That there should be nothing to call upon the defendants to be on their guard, or to be put upon inquiry; this is also erroneous, material, and prejudicial to the defendants.

V. "Notwithstanding the omission of defendants' counsel to ask that a verdict be directed in their favor, a motion having been made for a new trial upon a *case*, and an appeal having been duly taken from the order denying such motion,

.this court is now at liberty to look into the case for the purpose of seeing whether the merits of the case have been *fully and fairly* tried, and whether any injustice has been done" (MONELL, J., *Lennox* agt. *Hoppock*, 1 *Sweeney's Sup. Court Reps.*, 476; *Archer* agt. *Hubbell*, 4 *Wend.*, 514; *Geer* agt. *Archer*, 2 *Barb.*, 420; *Hastings* agt. *McKinly*, 3 *Code Rep.*, 100).

In *Geer* agt. *Archer* (2 *Barb.*, 423), WELLES, J., says:

"On a motion for a new trial upon a case, for the misdirection of the judge in his charge to the jury, it is not necessary that the charge should be excepted to."

VI. In addition to the foregoing considerations, it is respectfully submitted that the following exceptions are abundantly well taken, and should prevail:

(*a*) Defendants' counsel requested the judge to 'charge: "If the jury find that Hachfield & Co. purchased these bonds in the open market for full value, and in the usual course of business, without notice or suspicion, they were not bound to make a close and critical examination in order to escape imputation of bad faith."

This the court refused to do, saying that it would leave to the jury how much of an examination they were to make.

This refusal so to charge was certainly erroneous, and defendants' exception is well taken.

VII. This verdict is most grievously wrong; it is in violation of law; it has done manifest injustice.

(*a*) The right and duty of the general term of this court to set aside this verdict cannot be disputed. PECKHAM, J., in *Smith* agt. *Ætna Life Ins. Co.* (49 *N. Y.*, 211), referring to the general term of this court, says:

"It is their duty to set aside a verdict which is against the clear weight of the evidence; not merely, as this, against the evidence. Justice would be promoted if the supreme court should more frequently exercise its *unquestioned right* of reviewing verdicts upon the facts."

(*b*) There is every reason to apprehend that the jury was

misled by prejudice, or labored under gross misapprehension as to the law and facts. "It is, therefore, the imperative duty of the court to set aside a verdict which is clearly against the weight of the evidence" (*Burlew* agt. *Hubbell*, 1 *Sup. Court Reps.*, 237).

*Albert Stickney*, for respondents.

The plaintiff's suit is brought to recover bonds, or the value thereof, admitted to have been the plaintiff's property, and admitted to have been stolen on the 9th October, 1869.

It is not contradicted that the defendants purchased the bonds of one Kendrick, on the 9th October, 1869, and that they paid therefor ninety-six per cent of the par value, *i. e.*, $4,800.

The defendants testified that they had neither knowledge, information or suspicion that the bonds were stolen, or that Kendrick was not the real owner of the bonds.

Nor is there any witness who testified directly, in express terms, to the contrary.

Hachfield himself, however, testified he had had a transaction in stolen bonds before this one in question with Kendrick.

Kendrick then came to Hachfield, and asked him if he, Hachfield, "could use" some Poughkeepsie bonds. This was about ten days only after the robbery.

Hachfield then offered the bonds to no New York broker or dealer.

But. he immediately wrote to several out-of-town parties. Among them was one Van Antwerp, who made Hachfield an offer of ninety-eight. And Van Antwerp had been mixed up in another stolen bond transaction with Hachfield and Kendrick.

Hachfield says he had no suspicion or knowledge of the bonds being stolen; but it appeared in evidence that every party whose name was mentioned in the whole course of the

trial knew, at the very instant when the bonds came to their notice, that they were stolen bonds. Stoker, Taylor & Co., Hachfield's bankers, who merely received the bonds on deposit, spoke of it immediately, without their attention being called to the bonds. Guest knew it the moment the bonds were offered to him, and at once communicated with the plaintiff, though he had had no previous communication with the company. And he remembered even the number of one of the bonds. It is plain from the testimony of Rudd, who bid for them, that he knew they were stolen.

Hachfield then made no offer for them until he himself got a bid for them. He then went to Kendrick and purchased them at ninety-six. He did not ask the name of the party who sold them through Kendrick, but told Kendrick to be sure of his party, to be sure "that he was responsible."

Hachfield could not show in all his books an entry of any kind that showed the party from whom he took the bonds or to whom he sold them, and the letter in which he first offered them to Rudd, at Poughkeepsie, is missing. The bonds were an unusual bond, and were drawn in an unusual manner, being made, not payable "to bearer" but to "executors, administrators or assigns," with the name of the payee left blank.

Hachfield did, indeed, when his bankers sent him word that the bonds were stolen, telegraph to Poughkeepsie about them. But he did not telegraph to either the insurance company or to the financial officers of the city of Poughkeepsie, from whom he would have got his information immediately, but who would also have been likely to take steps to recover the bonds, if they were stolen. Nor did he telegraph that he had the bonds. He telegraphed to one Davis, asking him to "write immediately whether numbers forty-six to fifty, * * * *are stolen bonds,*" meaning to act according to the information received in reply.

The jury, under the judge's charge, gave a verdict for the plaintiff.

Dutchess County Mutual Insurance Co. agt. Hachfield.

The defendant excepted to the refusal of the presiding justice to dismiss the complaint, at the close of plaintiff's case.

The defendants also took certain exceptions to the rulings on evidence, and two exceptions to refusals of the presiding justice to charge according to certain requests.

No exception was taken to any portion of the charge as actually given.

The defendants also moved to set aside the verdict and for a new trial, on the ground that the verdict was against the weight of evidence. To the denial of this motion the defendants excepted.

I. The verdict is not against the weight of evidence.

The court will not disturb the verdict, unless it is perfectly clear, beyond a doubt, that the weight of the evidence is against the verdict.

Of course, in any case of this kind, the parties receiving stolen bonds invariably testify, on their oath, that they had no knowledge or suspicion that the bonds were stolen.

Sometimes, however, as in the present case, the jury do not believe that testimony. And the jury had a constitutional right not to believe it.

The simple fact that the defendants could show, in their books, no entry of any kind by which these bonds could be traced to the party from whom they bought, was, of itself, almost enough to make the jury disbelieve Hachfield's testimony, and be convinced of his *mala fides*. Every honest broker keeps accounts by which he can trace every bond and certificate of stock to the party from whom he buys and to whom he sells.

The defendants produced what was, in fact, nothing more than a cash book, and a cash book with very scanty entries. Kendrick's name does not appear there.

In addition to this ground of suspicion there were many others; the previous stolen bond transaction with the same parties, vendor and vendee; the peculiar mode of dealing; the strange manner of the negotiations. Moreover, the jury

gather from the manner of the witness whether or not he be an honest man and is telling the truth.

If the presiding judge at the time of the trial, who heard and saw all the witnesses, and the arguments of counsel, refused to set aside the verdict, most assuredly the appellate court will refuse to do so, having none of those means of judging of the correctness of the jury's conclusion.

All the circumstances of the case, both for and against the defendants, were submitted to the jury, with the utmost fairness toward the defendants, on the part of the learned justice who tried the cause.

Of course, the case against the defendants is circumstantial and one of inference. The inference is, however, to be drawn entirely from the defendants' own statements and acts, and they cannot complain.

And the point of good or bad faith is one especially belonging to a jury to determine, and the court will not, on such a point, disturb the finding.

II. The refusal to dismiss the complaint, on the plaintiffs' testimony, was too clearly right to be questioned for an instant.

The only facts at that point proved were the plaintiffs' ownership of the bonds and the robbery.

The defendant stated as his ground for the motion, that the defendants "purchased these bonds in open market, in good faith, and for a fair market value."

As to the circumstances of the purchase, there was then no evidence whatever in the case. The plaintiff's witness, on cross-examination, testified that Hachfield had made certain statements to him on these points. But there was no evidence on the points.

III. The only exceptions taken were to two refusals to charge as requested.

IV. The first of these two exceptions is as follows:

The defendants' counsel requested the following charge:

"That if the defendants paid full value for these bonds

without notice, the presumption is that they purchased them, in good faith, and that the burden rests upon the plaintiffs to show the absence of good faith." The court refused to charge otherwise on this point than had been charged.

The law is, on this point, that when bonds negotiable by delivery are proved to have been stolen, then the burden of proof is on the purchaser to show that he purchased, first, for value, and, second, in good faith.

This burden of proof does not shift from one party to the other at any time during the trial. The question of fact in this case is solely one of good faith (there being no question on the point of value), one which the jury are to determine on all the circumstances. The burden of proof remains on the defendant throughout, being in possession of stolen property, to show good faith. The evidence may be so strong in favor of the purchaser that the court is bound to direct a verdict in his favor. But otherwise the purchaser is bound to satisfy the jury, on all the facts of the case, that he purchased in good faith.

In the charge as given, the court repeatedly instructed the jury that the question was one solely of good faith; that this one circumstance was to be taken into consideration, with others, in determining this question of good faith, and that it was a very strong circumstance.

The law has always been laid down in the case of stolen bonds that the purchaser must show two points:

(1.) That he purchased for value, and (2.) That he purchased in good faith. "The party in possession of a negotiable instrument is *prima facie* the owner of it; but as soon as it is shown to have been lost or stolen from the true owner, the presumption is changed, and he must then show, *not only what consideration he gave for it, but also that he took the paper in good faith* in the ordinary course of business; *after that*, the party resisting payment may undoubtedly reply, impeaching the good faith of the transaction; which he may do by either direct or circumstantial evidence, that the plain-

tiff acted in bad faith in taking the bill" (*Edwards on Bills*, 310).

See, too, *Stalker* agt. *McDonald* (2 *Hill*, 101), citing the language of lord MANSFIELD from *Miller* agt. *Race*, the leading case on the point: "And the words 'for a valuable consideration' as well as '*bona fide* paid to him,' are italicized in the opinion of lord MANSFIELD, to show that *both are material and necessary* to protect the holder of a note against the claim of the former owner thereof" (*See, also, Steinhart* agt. *Boker*, 34 *Barb.*, 442; *Lord* agt. *Wilkinson*, 56 *Barb.*, 594; *Fulton Bank* agt. *Phœnix Bank*, 1 *Hall*, 562; *Chitty on Bills*, 255–260; 3 *Phillips' Ev.*, 159–162; *id.*, 820).

There are certain cases which say, in general terms, that when the holder of negotiable paper has once shown himself to be a holder for value, then the *onus* is on the other party to prove *mala fides*.

This is the law as to negotiable paper which has been obtained without consideration, or by fraud.

But the law is otherwise as to notes or bonds that have been stolen. In the case of securities that have been stolen, the holder is compelled to show not only a holding for value, but also *bona fides*.

V. The request was clearly too broad.

The court very properly ruled that it was for the jury alone to say how "close and critical" examination the defendants were bound to make.

The court in fact charged, in effect, that under certain circumstances no examination at all need have been made. "If you find from the evidence and surrounding circumstances that Hachfield & Co. bought these bonds in good faith, without any reason to suppose that Kendrick had wrongfully come into possession of them, *then they are protected*," *i. e.*, whether or not they made *any examination*.

"I again say, in conclusion, that it is a *mere question of good faith*. If you find that Hachfield & Co. acted in good faith, bought these bonds in good faith, they are to be protected."

This is the whole law on the point. Every special circumstance is to go to the jury for what it is worth.

The judgment should be affirmed, with costs.

DANIELS, *J.*—This action was brought to recover the possession of five bonds, issued by the city of Poughkeepsie, for the sum of $1,000 each. They were payable in blank, with the addition, following the blank, of the terms "his executors, administrators or assigns," &c.; and these terms, following the space left for the insertion of the name of the payee or holder, were sufficient to render them negotiable under the mercantile law of the state as it now seems to be settled (*Brainard* agt. *N. Y. and Harlem R. R. Co.*, 25 *N. Y.*, 496; *White* agt. *Vermont and Mass. R. R. Co.*, 21 *How.* [*U. S.*], 575; *Michigan Bank* agt. *Eldred*, 9 *Wallace*, 544, 551, 552).

The evidence showed that these bonds had been feloniously stolen from the plaintiff, their lawful owner, shortly before they were purchased by the defendants, and that imposed the obligation upon them of proving to the satisfaction of the jury that their purchase was made for value, and in good faith, before they could establish a title to the bonds superior to that of the plaintiff, as the preceding owner (*Farmers' Bank* agt. *Noxon*, 45 *N. Y.*, 762).

Where fraud or illegality in the negotiation of commercial paper is shown, the law presumes a want of consideration in the transfer. It supposes that "the original party, not being able to sue upon the instrument himself, has handed it over to another to sue upon it for his benefit. This presumption, so raised by the law, must be rebutted by the holder showing affirmatively that he gave value. It is not quite correct to say that the *onus* of proving value is cast upon the plaintiff; but the plaintiff, being presumed to stand in the shoes of the party from whom he took the instrument, and to be his agent for the purpose of carrying out the fraudulent or illegal

intention, is bound to get rid of that presumption " (*Fitch* agt. *Jones*, 32 *Eng. Law and Equity*, 134, 137, 138).

Proof was given by the defendants tending to overcome the presumption arising out of the circumstance that the stolen bonds were found in their possession, by showing that they were purchased by them for a valuable and adequate consideration, without notice of any infirmity in the title of their vendor; and it is upon the disposition which the court made, at the trial, of the questions arising upon this proof that the main effort is made by the defendants' counsel to sustain their present appeal. After the charge had been delivered to the jury, the defendants' counsel requested the court to instruct them that if " Hachfield & Co. purchased these bonds in the open market for full value, and in the usual course of business, without notice or suspicion, they were not bound to make a close and critical examination in order to escape the imputation of bad faith in the purchase." The court declined to charge this proposition, and left it to the jury to say how much of an examination they were to make; and the defendants excepted to the refusal. This exception is the only one required to be considered in connection with the charge of the court, because the preceding request, though in the main correct, was finally coupled with an untenable proposition, and for that reason properly refused.

The proposition presented by this exception seems to be faultless. For if the defendants did, as it contemplated, purchase the bonds in the open market for value, in the usual course of business, without notice or suspicion, then they were not bound to make either a close or critical examination, either of the bonds or into their history, in order to escape the imputation of bad faith in the purchase. The terms made use of did not complete or finish the idea pointed at by the words " notice or suspicion." But as the whole controversy hinged upon the question whether the defendants' purchase was made in good faith, what was really intended by their use was clear and conspicuous. It was, in substance, without

notice or suspicion of the robbery by which the plaintiff was divested of their possession. That was, under the circumstances, their clear implication, and with that construction the proposition which the court declined to charge was sound in all respects; for it presented the case of a purchase for full value, in the ordinary course of business, without notice or suspicion of the robbery creating the infirmity of title; and that was all which the law required to be established to protect the defendants as the owners of the bonds. Under those circumstances, if they had been submitted to, and found as proved, by the jury, the defendants were not bound to make any examination or investigation whatever to escape the imputation of bad faith in their purchase of the bonds. For they were of themselves sufficient to show a purchase in good faith for value and in the usual course of business; and the law requires no more than that in order to vest the buyer with the title to negotiable securities (*Welch* agt. *Sage*, 47 *N. Y.*, 143; *Belmont Branch of State Bank of Ohio* agt. *Hoge*, 35 *N. Y.*, 65).

There was nothing in the charge which avoided the effect of the refusal to submit this proposition to the jury. That was still more unfavorable to defendants' title, for it required them to satisfy the jury that the bonds were purchased by them in the ordinary course of business, " and that they did not procure them in such a shape as would put a prudent man upon inquiry ;" and that " they bought them and paid for them without reason to suppose that there was anything wrong about them."

" That where parties *act in good faith* in the purchase of securities in the open market, without any attending circumstances which would call for inquiry or put a party upon his guard, the purchaser would be protected," &c. And it was further added, " if you find from the evidence and the surrounding circumstances that Hachfield & Co. bought these bonds in good faith, without any reason to suppose that Kendrick had wrongfully come into possession of them, then

they are protected." These were the prominent portions of the charge, stating what the defendants were required to establish in order to succeed in their defense. And they required too much of them, because it was clearly to be implied from them that a purchase for value and in good faith was insufficient in case there was enough shown to put the defendants upon inquiry, or upon their guard, or arouse their suspicions that the seller had wrongfully acquired possession of the bonds.

While all that the law required to protect the purchaser is that the purchase shall be for value, in good faith, and in the ordinary course of trade ( *Welch* agt. *Sage, supra; Goodman* agt. *Simonds,* 20 *How.* [ *U. S.*], 343).

And these propositions were not corrected by the general statement afterwards made that the defendants were to be protected if they bought the bonds in good faith, because the preceding qualifications of the general proposition were in no sense withdrawn or restricted. The jury were left with the impression conveyed by the charge, that, in addition to good faith in the purchase and value paid for the securities, the defendants were bound to satisfy them that it was made under circumstances that would not put a prudent man upon inquiry, or cause him to suppose there was anything wrong, or put them upon their guard, or lead them to suppose that the bonds were not regular.

To correct these qualifications, at least the proposition the court declined to charge was required, and its refusal must have been decisive with the jury, that a purchase for value, in good faith and in the usual course of business, was not in itself sufficient for the protection of the defendants.

A new trial cannot be ordered for misdirection in the charge, for the simple reason that it is not one of the grounds which, under the Code, can be considered in support of a motion made for that purpose upon the minutes of the court (*Code,* § 264). For that reason the effects of these directions are not otherwise before the court on the present appeal,

Dutchess County Mutual Insurance Co. agt. Hachfield.

than they are appropriate for consideration upon the effect of the refusal to charge as requested by the defendants. In that respect they have been examined to show that the proposition declined was not included in anything which had been said; and as it had not previously been submitted to the jury, and was right and proper for their consideration, the court should have charged it when the request was made. The refusal to do so was error, and for that reason the judgment should be reversed, and a new trial ordered, with costs to abide the event.